All right, we see Ms. Rosen. We're waiting for her colleague. He's here. Oh, Stephanie. I'm sorry. Stephanie Nathanson. I'm sorry. She would like to come, too. Yes. We're talking about the appellee. Oh, the appellee is here. Scott Howie, Your Honor. Okay, great. All right. We're here in the First Division of the First District Appellate Court of Illinois in the case of Deveny v. Lincoln Park Family Physicians. John Tenhunfeld and Wendy Plugstra. Pardon me if I mispronounce those. In the case of 1-22-1043. My name is Terry Lavin. I'll be presiding today along with my colleagues, Justice Mary Ellen Hagelin and Justice Aurelia Puchinski. And what we're basically looking for is like 20 to 25 minutes from each side. And if we unduly burden you with questions, we'll be a little lenient on the time. But generally speaking, we like to get it done around that amount of time. And this is a two-issue appeal from what I understand. One is the... Okay. Three-issue. Three-issue. Then you can remind me of the third when we start. So let's first hear from Ms. Rosen. Good afternoon, Your Honors. Nice to see you all. I wish we were in person. But this is a three-issue case from two on jury instructions and one on a directed verdict. This was a death that never should have happened. A 43-year-old man got a carotid dissection and he was properly given anticoagulants, but he was over-anticoagulated and wasn't treated and he died. So the first issue is about the jury. The jury asked a for each of the three counts need to be unanimous by the jurors. Both attorneys gave suggestions to the court. Both of them were lacking. The judge, however, went off the deep end and answered the question, yes. The one-word answer, right? I'm guessing you're thinking that there's another one-word answer that no, that could have been. No, that's correct. Thank you. Yes. And I thought that before, but since I briefed this case, the case of Gellich versus advocate has come down and made it absolutely sure and clear that the answer was no. Plaintiff's counsel started out on the right foot. She said, no, the decision for each of the three counts does not need to be unanimous. That was right. But then she said, if they can agree on one, they can move forward. That was wrong. Defendants said the correct answer was for the jury to review the instructions given. That was wrong, because there is no instruction on this. The IPI does not cover this. So the court's answer was just dead wrong. The court has an obligation to answer the question accurately and specifically. That's from Van Winkle versus Owens Corning and Peoples versus Childs. And giving a wrong answer has been held to be prejudicial error. And I think that this is a makes it very clear that they could have like four jurors could agree on the first allegations that is wrong. Six can agree that the second allegation is the right one. And two can say that the third one is the right one. That's all OK, as long as they unanimously find that the defendant did something wrong. And so that was not here. And by the way, I did say in my reply brief that the defendant's instruction was proper, but that's it on page five. That's wrong. OK, this is a very simple question. I don't I don't have like five minutes more. I don't have anything else to say about this. This was just wrong. It was obvious in the in the issues instruction. It's indicated that the defendant was negligent in one or more of the following respects, right? Yes, I believe. Yes, that was also said is that it doesn't say all three. It just says one or more. So you could have one. You could have two. You could have all three. But the answering the question with yes was not appropriate, correct? It's totally inappropriate. And I don't think that any of the jury instructions defendant says all the jury instructions they the rest of the jury instructions in plaintiff interclosing argument, they kept saying one or more. But that doesn't cure the problem here. She gave the absolutely wrong answer, plain and simple. So and the defendant even concedes in their brief that the jury could have been asking about several different concepts. We don't know if that's at page 20 of their brief. But the other answer, but nothing else remedies it. That's the only question that I think that exists here is that the plaintiff's closing argument and the issue instruction take care of this. And then there's a problem. The issue instructions, though, are bad to boot. So you bootstrap these together, and the error becomes even more egregious. In this situation, the thrust of the case against the nurse, I'll call her nurse, Wendy, and I'm going to call the doctor, Dr. T. When they called Wendy, the plaintiff's allegation was that Wendy did not ever tell them go to the emergency room. And she gave them alternative advice, which was wrong. And that she didn't let them know how important this was. Now, of course, her story was, oh, yeah, I told them, I told them three times. So it is due to credibility there. But the judge, the judge did not let the issue instruction be a proper one. In this case, the plaintiff wanted to have those allegations that she failed to tell them to call 911. And the judge said, No, you know, the other side, they disagree with that. Yeah, of course, they disagreed with that. That's the they're, they were denying everything. But that's not to say that he wasn't entitled plaintiff wasn't entitled to get the instruction that was for her theory of the case that the rules on applying on jury instructions in this issue are very well settled. And by the Supreme Court in Mikulovic, is that how you pronounce it? I believe Bruce Papp's case from a number of years ago, it says the parties are entitled to have the jury instructed on the issues presented and principles of law to be applied and the necessary facts to be proved to support its verdict. The threshold for giving an instruction in a civil case is not a high one. That was I mean, the case and they were not allowed to use the words emergency room. She didn't tell him to call the emergency didn't tell him to call 911 or go to the emergency room. The judge said no to that. So and then also, I know reading this is not the best way to present an argument. But there's a great little quote from Dylan versus Evanston Hospital, another Supreme Court case. It must be remembered that juries are composed of lay persons who are not trained to separate issues and to disregard irrelevant matters. That is the purpose of jury instructions. The function of jury instructions is to convey to the jury the correct principles of law applicable to the submitted evidence. And as a result, jury instructions must state the law fairly and distinctly and not mislead the jury or prejudice the party. Here, I think the jury was severely misled and plaintiff was severely prejudiced by the instruction. The court would not and she wouldn't give their their primary thrust to the case. Why? Why? She said there's a pure, dark, black and white difference in the testimony on the case. That's why there was a trial. That's why there was no settlement. So the judge did say she'd allow the plaintiff to amend the allegations. And plaintiff's counsel said, well, okay, I can take my allegations that can put them all into one allegation, fail to call 9-1-1, tell them to call 9-1-1, go to the emergency room and tell them how serious this was. But the judge said no to that. So it wasn't as though plaintiff acquiesced to it. Defendant argues that we had to submit a written instruction. That's not true. That's not accurate. That was said in Van Winkle. And I quoted that mistakenly in my brief. But Galovich says, no, you don't have to. And Mikulovic, that case also says you don't have to put it in writing. He gave an alternative instruction. It doesn't have to be in writing. So that was another serious error. When you combine the two, they got the wrong, they didn't even understand this was a one-count complaint. Their question is, do each of the three counts have to be unanimous? Let's talk about the physician defendant, Dr. Ten Hunfeld. And there was a directed verdict in his favor. What were the allegations of, what was the proof as to the deviation from the accepted standards of care that was adduced by plaintiff's experts? Okay, first of all, there's no issue that the deviations were said that he deviated both from the standard of care by not checking Pat's blood 48 hours after discharge, and that this deviation approximately caused his death. He then opined to, I've got them all, Dr. Papernak opined to a reasonable degree of medical certainty that if he had, if Dr. T had acted as a reasonably careful physician, he would have seen Pat on the 27th, he would have seen that there was a bleed already going on because he had symptoms already at that time, his skin was bruised, and he should have done something. And he said, he's at risk for having an excessive bleed. He already had one bleed. And as I again, as I said before, at that age, carotid dissection, most, it's very common to have a vascular abnormality. So he's at risk to have a vascular abnormality elsewhere. So you have to keep a close eye on this patient. He did not keep a close eye on this patient. He did not convey in the slightest that this guy was at risk. They were leaving, they were moving to Texas, they were going to stop along the way. Dr. T was going to see the man the day before they left, but it was too late because he was dead then. And he said, the doctor said, well, I was going to tell him then to stop along the way and get your blood tested. But nothing in the record suggests that the doctor made it plain to the plaintiff and her husband that this was. Can you tell us specifically how many deviations from the accepted standard of care were offered up through the testimony of Dr. Kaepernick? Three or four? Three or four. He opined to a reasonable degree of care that he should have checked. It was a 48 hours. The two, if he had seen Pat on the 27th and stepped down the Coumadin dose, and he would have not ignored the vascular abnormality and kept a close eye on him, it would have been better. If he had seen Pat, he could have examined him. And his quote is, he should have realized that Pat had signs and symptoms of bleeding, and that should have made a big difference. Pat's bleed could have been stopped if Dr. Tenhunfeld had seen Pat on the 27th. What were the problems that the trial court had with the testimony and the questioning of the plaintiff's expert that led the court to grant the motion for a directive verdict? She said that he didn't give proper evidence of proximate cause, that his opinions were speculative. Okay. They were, yeah, I don't, I don't see, and defendant says, well, in the brief, what they say is, well, they, opinion's words elaborated on, and they were conclusory. Nobody moved to strike any opinions. There was never any motion, uh, eliminated. Did the defendants claim, uh, that on cross-examination, they were able to get Dr. Kaepernick to withdraw in some way, any of his three opinions as to deviations? No, no, no. They tried to, as a matter of fact, uh, there was a little argument between defense counsel and the doctor about, about whether counseling him about being more, you know, that his case was very serious, you know, didn't matter because he never made it to that appointment. And the doctor would not give in on that at all. Uh, so no. And then also, um, let's see, I'm sorry. Uh, I never, yeah. I also try, defense counsel also, uh, tried to, you know, he tried to pull it out more. He tried to go on further about that. So there was no, no claim of that. And no, but the question is, is it, what's speculative? I don't even understand what was speculative. He said, if Dr., Dr. Kaepernick also said that the, you know, that the failure to recognize the vascular abnormality was a deviation that approximately caused the death. If Dr. Tenhunfelt had seen Pat on April 27th, he could have examined him and made sure that no abnormalities were occurring. He should have realized that Pat had already had signs and symptoms of bleeding, and that should have made a difference. Pat's bleed could have been stopped if he had been seen earlier. Okay. No further questions for me. We're talking about the, you saw him on the 25th, and the plaintiff's case is that experts said, well, you shouldn't have seen him again on the 27th. He was planning this, the Dr. Tenhunfelt was planning to see him on the 28th. And the reason it makes a difference between those two days, whether it's two days later or three days later, is because the INR, which is defined as the international normalized ratio, when you take that blood test, it reads for something that's three days old already. Exactly. And so, to me, that difference of 24 hours, the difference between seeing him two days later or three days later, testing him two days later or three days later, made a big difference because the two days, you're already three days late on what his true INR is. But by three days, if it's going south, it's already gone more south. And so, that two day window gives you, and the expert testified that 48 hours is the standard of care. Is that correct? In this case, not in all cases. In many cases, 72 hours is right. But in this case, where you have a healthy young man, 43 years old, with a vascular abnormality, it had to be. Plus, he'd already had a bleed after a spinal cancer. He needed a blood patch, yes. So, there was already some indication that there was something wrong going on. Well, actually, there's enough to hang up. I don't know enough to say that. I appreciate you saying that. But I don't know if that's a proximate cause, that that would have been a sign. Nobody said that. And from having the blood needs of the blood patch, they should have known that he was over anticoagulated. But yes, I'd go with you all the way. Ms. Rosen, I'd just like to clarify, what signs and symptoms does the plaintiff believe that the doctor would have discovered had he treated the patient earlier? Well, apparently, your skin starts to bruise and gets black and blue, and it swells. And I believe, I'm not 100% sure, but beforehand, his eye was a problem. And I don't think his eye was better, but I'm absolutely confident that it's the bruising and the swelling. And it's your position that the expert covered that? The expert said it, whether it's true or not. Whether it's true or not, it doesn't matter. He said it. That's not speculative. He said if he had seen him, a reasonably competent, careful doctor would have seen that there were signs of bleeding already, and he would have done something, sent him to the emergency. That's what he said. There's nothing speculative about that, and there's nothing conclusory. And all the defendant says about it is, well, he didn't elaborate on his causation opinions. That makes them speculative. They don't cite any case for that. I have the very cavalierly, in my opinion. So, and it's notable, they never moved to strike his opinions. So, I did have arguments on appeal, but I'm willing to rest on my griefs unless you want to hear anything about it. I said that it really wasn't, there were two little, two matters that happened besides. One was, there was never anybody testified that the literature was authoritative on direct, the defense counsel was allowed to cross-examine Dr. Papernik. That's a small matter, but more important is after Dr. Tenhunfeld was given a directed verdict, he was still allowed to testify over plaintiff's objections and all this irrelevant material about whether he deviated from the standard of care. And I think that was highly prejudicial. So that if you're going to address, if I'm going to be so fortunate as to win this appeal and you're going to address that issue, that should not happen again. Could you talk a little bit about the nurse? Pardon? Could you talk a little bit about the nurse? The nurse. The nurse. The nurse talked to the victim's wife, the deceased wife, three times on 4-28, 2-22 in the morning, at 3-22 in the morning, and at 5-05 in the morning. Exactly. And their conversations, their testimony was completely at odds. Allison Devaney, the plaintiff said she never told us to call the ER. Wendy said, oh, I told him, I told him, I told him. So that was for the jury to decide. And I think it's in particular, going to the last point I just made about when the other doctor, when the doctor defendant who had been, you know, gotten out of the case on a directed verdict gets to take the stand and say, I did everything right. I told him that anything changed, he had to go immediately to the emergency room. That would be very significant because then it would nullify whatever Wendy did or didn't do. But the nurse's notes, only the third note, the one from the call at 5-06 say anything about calling 9-1-1. Is that correct? Because at that point, Allison Devaney had contacted her friend, whose mother was a nurse, and the mother and the friend called her back after talking to her mother, and the mother said, get him to an emergency room. So she was reporting that. Most interesting, it's not a point on appeal, but the nurse had taken handwritten notes. And then after she learned that Pat had died, she transcribed her notes into the record and she shredded her handwritten notes. So this became a problem at trial. The Plaintiff's Council, you know, wanted that to be able to go into that. The trial judge said no, and it's a bad situation between the Plaintiff's Council, but that is a fact of the case. There's no question that she had taken hand notes and she destroyed them after he died when she put her notes in the record. So they were at complete odds. Thank you. I have nothing else. Unless you have more questions. I think we may have lost Justice Lavin. Justice Lavin had trouble with his audio in the first case we had. I can't tell what that happened to him. He fixed it the last time. So I'll just give him a minute. But just for the record, I have no further questions. Nor do I. Okay. So since we have Justice Lavin back, then I'm sure we'll ask Mr. Hollingsley. Just as an explanation, they're transitioning our computers, and there's a lot of confusion about some parts of the transition. I can hear you now, Justice Lavin. Okay. You guys can hear me now? Darren can hear me? Yes. Okay. Sorry about that. Scott Howell is here from UNO. Thank you, Your Honor, and may it please the court. I am Scott Howey. I represent Dr. John Tenenfeld, Wendy Plextra, and Linkin Park family physicians. The plaintiff gives this court no reason to disturb the judgments below, and it should affirm. The jury was properly instructed in the issues it was to resolve as to Nurse Practitioner Plextra and how to resolve them, including the answers to the jury's own question on that score, giving this court no reason to disturb the jury verdict in her favor. And the evidence did not present a question regarding proximate cause for the jury to resolve as to Dr. Tenenfeld, calling for the directed verdict in his favor. These rulings were legally correct and within the trial court's discretion, and the judgment should be affirmed. First, with respect to the trial court's answers to the jury's question, taken as a whole, the trial court's answers were adequate to address the jury's concern about unanimity. The plaintiff herself acknowledges that the question was ambiguous. In fact, I'd say calling it ambiguous is almost an understatement. Even now, we don't know what the jury meant by counts or whether it needed to be unanimous as to each count, whatever that meant. The term count, as used by this jury of laypersons, clearly was obviously wrong, or at least not used in the sense that lawyers and judges talk about distinct causes of action or the parts of a complaint or an indictment. The parties could only speculate at trial that the jury meant the three allegations of negligence in the issues instruction. Bear in mind that the question didn't refer to the issues instruction directly or even obliquely, and so the reference to counts is really kind of a mystery. The trial court acknowledged that the jury gave the second answer to the question, and really it's the second answer that's at issue here. It's not the yes. Neither of the parties suggested yes as an answer. In fact, the defense counsel suggested, in essence, the answer that the judge eventually gave, which was to consult the instructions. So we're not talking about the answer that Ms. Rosen spent most of her argument on this point talking about. At issue is the second answer, the one that the judge gave after giving it some more thought and recognizing that there was a great deal of ambiguity in what was really an opaque question from the jury. Because of that ambiguity, it wasn't necessary and certainly wasn't even appropriate to tell the jury that the first answer was wrong, chiefly because we don't know if it was wrong because we don't know what the question meant. Everyone agrees that the trial court shouldn't have simply answered yes, not because that was the wrong answer, but because we just don't know what the question was. And that's why the trial judge was properly cautious in not saying that the previous answer was wrong or that it was right. Saying that it could be misinterpreted and that it was incomplete was a properly cautious way to consult the instructions that had already been given. And that's a directive that the plaintiff doesn't challenge. There's no suggestion from the plaintiff that the judge shouldn't have given that instruction. In fact, I believe that's agreed. The only thing that the plaintiff has challenged in the post-trial motion or on appeal with regard to the answer is the trial court's decision not to tell the jury that the previous answer was wrong. And there's no way it could have given that answer. There's no way it could have told the jury that it was wrong the first time because we don't know that. There are other ways in which to interpret the question that do not refer to the issues instruction that would have required the answer yes. One that we've suggested in our briefs is the suggestion that when the jury was talking about count, whatever that meant, it could have been referring to the three aspects of a prima facie case, negligence, causation, and damages. And the answer to that question would be yes. The jury does have to be unanimous in as to each of those elements of a prima facie case. So if that's what the jury meant, then the answer yes was correct. When you get right down to it though, since we don't know what the jury was asking about, we don't know what the right answer was. And while yes might have not have been the correct answer to give, it would have been equally incorrect to then tell the jury that that answer was known to be wrong because that's not something we know at all. This is very different from the Galich case, the recent case that Plaintiff's Council secured leave to discuss an oral argument. That's a case that has some similarities to this but some critical differences that make it unhelpful as a rule of decision in this one. The most critical distinction between this case and Galich is the clarity of the question that the jury was asking. In Galich, in fact, the jury asked a pair of questions, both of them directed expressly and very clearly to the elements of the issues instruction and the allegations of negligence there. And the jury was very clearly asking the judge in that case if it needed to be unanimous as to each of the allegations of negligence. Or it proposed an alternative, was it enough that everybody agreed that the defendant had been negligent in some fashion? The Galich, this court determined in Galich that the answer to that question was no, that they didn't have to be unanimous. But at least in that case, the court knew what the jury was asking. The parties were able to discuss the issue clearly and coherently and to give an answer that was, the court determined was the correct answer, that this court determined was correct and affirmed in that case. So the plaintiff here argues as if the jury were asking the same question as in Galich, but that is only an assumption. It's a possibility, but when the has no legal meaning that is relevant to the situation at hand, that is merely an assumption. It's pure speculation and far from clear. Plaintiff's counsel, in fact, at trial, trial counsel forfeited the Galich argument, or at least chose not to pursue it by arguing in open court that the jury would be, it would be appropriate for the jury to proceed if they agree on one. And this is at the time we're talking, we're assuming for the sake of argument that they were talking about allegations of negligence. The answer that the plaintiff's counsel proposed assumed that the jury would need to be unanimous on one, didn't need to be unanimous as to all three, but needed unanimity as to one. So that is not what Galich eventually held. Of course, Galich wasn't available precedent at the time, but if she was going to advance that was the time to make it. Instead, she offered a construction of the question that had a potentially correct answer in the affirmative, at least at the time, even if Galich later held otherwise. So this is all further evidence that the jury's question was opaque in ways that might not have made yes the wrong answer and made the trial court right to back away from that answer without calling it right or wrong. Calling it incomplete, saying it could be misinterpreted, was a more prudent way of saying in essence to disregard the prior answer and to look to the instructions already given, especially to the two instructions that were attached to the court's answer. So that gave the jury additional guidance without saying whether the previous answer had been incorrect or not, but simply saying in essence that it wasn't to be relied upon. So the answer to the jury's question is really no more than a hiccup here, which the trial court promptly fixed without misleading the jury, and it's no basis for a new trial. Second, with respect to the substance of the issue's instruction, it was no abuse of discretion for the judge to give the instruction it did because that instruction sufficiently instructed the jury as to the issues it was to resolve succinctly and without undue emphasis or the repetition that the plaintiff's proposed instruction suggested, as opposed to that instruction which the trial court deemed repetitive and duplicative. For example, the instruction which the plaintiff suggested initially, the one that's at page 228 of the common law record, the suggestion that the instruction ought to refer to providing improper treatment advice which is what the trial court did use, or I'm sorry, that is a portion the trial court struck from that instruction because it found that it was necessarily subsumed into the initial two subparagraphs regarding the alleged failure to provide proper instruction. So providing improper instruction, the court concluded, within its discretion was essentially the same thing, or part and parcel of providing a failure to provide proper instruction and advice. Likewise, failing to inform the plaintiff of the potential risks of not going to the ER is also subsumed as part and parcel within those same two initial subparagraphs. Note also, and Ms. Rosen acknowledged this today, that the trial court did offer to allow the plaintiff to include a reference to calling 911 in the first two subparagraphs, but the plaintiff didn't take her up on that. So that was an available remedy that the trial court did offer for what the plaintiff wished, one that the plaintiff didn't avail herself of. And the plaintiff did have ample opportunity to make every argument that Ms. Rosen has alluded to today. The fact that they might not have been included expressly in the issues instruction did not make them off limits to the plaintiff in closing arguments. The plaintiff was never barred from making the very arguments that the alleged failure to tell the plaintiff to go to the ER, the alleged failure to tell the plaintiff to call 911, were the failure to give proper instruction and advice. Those are the very things that were at issue. The plaintiff's counsel took the very earliest parts of her closing argument to tell the jury that that's exactly what the instruction meant. And so the effort by the trial judge to pare down the instructions, to make them less repetitive, to put less emphasis on particular parts of one party's case consistent with the committee notes on the IPI, that was perfectly within the court's discretion in instructing the jury and was an appropriate way to instruct the jury. Okay, I'd ask you to wrap up so we can get to questions. Certainly, Your Honor. I do want to briefly address the plaintiff's citation of the McQueen versus Green decision that came up in the reply brief. McQueen is this court's decision from 2020 in which this court reversed the jury verdict for alleged failures and defects in the issues instruction. In that case, though, the court was concerned with alleged errors in the law that the instruction set forth. In that case, the court found that it was error to omit the final sentence of the pattern instruction on agency, which allowed the jury to find against the employer defendant, even if the employee defendant was not liable, which it called an incorrect statement of law. And it also gave no issues instruction at all for willful and wanton conduct, which this court said was no small matter and no instruction on the burden of proof, which this court called significant. So those are the sorts of things illustrated by McQueen that support a new trial on the basis of defects in an issues instruction, not disputes over the degree of detail that the plaintiff wishes to have in describing his or her case, but errors in the law that actually mislead the jury. And it's notable as well that even if the things that this court found to be reversible error in McQueen were at all similar to this case, the Supreme Court later reversed that decision and found they weren't reversible error at all. And so McQueen is particularly insufficient precedent for a new trial in this case. I'm happy to take a moment to address the directed verdict, if the court is still willing to hear about that. The directed verdict in favor of Dr. Tenenfeld was appropriate and the trial court was correct to direct that verdict because of the plaintiff's failure to establish causation. The only, the alleged deviations from the standard of care essentially boiled down to, by my count there are two, the failure to test for the INR on April 27th within 48 hours of the last INR test, and the failure to inform the plaintiff and the decedent of the risks of symptoms and changes in condition. In particular, the allegation that something should have been done differently on April 27th is a particularly defective aspect of the plaintiff's prima facie case that did not support causation. That is because the causation gap left behind by the expert, Dr. Papernik, testified that earlier testing of the INR might not have changed the treatments. It was unclear from his testimony that even seeing the decedent on April 27th would have concluded, would have led Dr. Tenenfeld to conclude that he was suffering the aortic dissection. Bear in mind that the timing of that day would only have allowed Dr. Tenenfeld to see Patrick in the morning of that day, and it wasn't clear that any of the signs and symptoms of his condition would have been evident at that time. Certainly it was unclear that his INR would have suggested the aortic dissection at that time. The timing is important because it gets to what Dr. Tenenfeld might have been able to detect had he complied with the standard of care as the plaintiff described. So even a deviation, the deviation, alleged deviation in not seeing him on the 27th couldn't be causally linked in any degree of necessary certainty to his eventual demise because it couldn't be shown that he would have displayed the signs and symptoms of the condition with enough clarity to allow Dr. Tenenfeld to detect that condition at that time. If his condition couldn't have been detected at that time, then the failure to see him wouldn't have had any causal impact. And without causation, the prima facie case is not established. And this situation is not unique to this case. It's of a piece with cases like Aguilera and Susness and Townsend, cases in which the alleged deviation from the standard of care essentially amounts to a failure to detect a condition or to find a condition, something that may indeed be determined by expert testimony to be a deviation from the standard of care, but can't causally be linked to the eventual injury or death because there's no evidence to show what would have happened. Bear in mind, in this case, the plaintiff presented no surgery expert. So the suggestion that seeing Patrick earlier would have led to some sort of surgical intervention that might have saved his life is speculative in the to send the case to the jury. And in this case, it was appropriate for the trial court to direct a verdict on that basis. I welcome any questions the court might have as to any of these issues. My colleagues. Let's start out with a simple agreement. You would agree that the plaintiff in this case, oddly enough, had specifically three allegations of medical malpractice, right? Deviation from standard medical care. I think it depends on how you count them. I don't think we're in dispute as to what the allegations were. Okay. I don't mean to be coy about that, but I think and you would agree that the jury does not have to specifically find that the plaintiff proved all three allegations of negligence, correct? I agree that that ends up being the holding of the Supreme Court. But for the time being, this case is a little bit different than Gaelic, though, because they were asking if there were, you know, let's say seven allegations of negligence. Do they all have to agree that it was allegation number three rather than four and five or whatever? What we're talking about here is the fact that the way that the court answered the question, it indicated that the jury had to find all three allegations of negligence to be proved. Well, I think it's unclear what the judge's answer meant, Your Honor, because it's unclear what the question meant. It really does depend on what the jury was asking before we can really determine what yes meant. Okay, and what the court, I have it right here, not that you can read it, but the court handed the jury an answer that says the answer to the question about unanimous verdict was incomplete and could be misinterpreted. Wouldn't it be more accurate to say that as it relates to the allegations of malpractice that the answer was wrong? If we knew that the jury was asking about the allegations of malpractice, I wouldn't disagree with that. We don't know that at all. So how do you find out? How does the court find out in a circumstance like this where they could be talking about negligence, causation, and damages as the three counts, so they could be talking about A, B, and C, the allegations of negligence. How do you find out? Why wasn't there an attempt to talk to the jury about this and ask them to discover what was wrong? I've never seen a case, Your Honor, in which there has been that sort of give and take between the judge and the jury, even in response to questions. Obviously, questions are not uncommon, and answers to those questions are not uncommon. The sort of exchange that you're talking about, I think, would be very uncommon and quite unique. A way to approximate something like that, however, might be to do what defense counsel initially suggested in the first place, which was to direct the jury back to the questions and tell them that the answer is there, because I think it is fairly there, assuming that, again, assuming that we're talking about allegations of negligence, and I'm only assuming that for the sake of argument. If that is not enough for the jury to figure out the answer to its question, the jury is in a position to ask another question. The jury in Galich, for example, asked a second question, because it wasn't satisfied with the first one. Was there any indication in the record that the lower court attempted to clarify what the jury question was referring to? It was, well, there was discussion amongst the parties. No, I know, but I'm talking about the trial judge and the jury. Was there any indication that the trial... I'm sorry. No, you go ahead. That's fine. There's no suggestion in the record that there was an attempt to ask the jury what it meant. In fact, I think it's fair. I think we're in agreement that there wasn't such an attempt. There's an effort going on between plaintiff's counsel and defense counsel to try to come up with a way to deal with this problem, because they both felt that the judge was wrong when she answered yes. Is that right? That's in dispute, Your Honor, and there's no record that reflects that. There is an affidavit from plaintiff's counsel that suggests that that occurred, but that is that it's nothing on a transcript, an official transcript of any kind, no bystanders report. The affidavit does not meet the standards for a bystanders report. And so that's a disputed statement about things that happened out of court. It is true. We can glean from the record and from what we know that defense counsel did not suggest the answer yes in the first place. Defense counsel at the very start suggested that the jury be told to consult the instructions, which in essence is what they were eventually told. And as you asked, there's no indication that the judge tried to ask the jury what it meant by counts. There is discussion and a great deal of colloquy that is on the record with respect to when the first answer was given, with respect to what the jury meant by counts. And I think the agreement was that we really didn't know and that we could guess that it might have been the allegations of negligence, but that's not been agreed upon or can't be taken on faith. It's certainly not something that's evidence from anything in the record or on the transcript or in the jury's questions. Okay. Thank you very much. We'll hear some rebuttal from Ms. Rosen. Thank you. Okay. Several points. If the jury, if the jury's question was ambiguous and the judge's answer was totally wrong, no matter what, whose job was it to fix this up? I like your question, Justice Levin, that she did. She made no effort to determine what the jury meant. She could have sent the jury back to clarify their question, but she didn't. And the bottom line is, it's the jury, it's the judge's power, the judge's job to correctly instruct the jury. In this case, I said before, and I'll say again, both plaintiff's counsel and defense counsel's suggestions, they were just suggestions about how to answer the question were incorrect because it isn't enough to just go back and look at the instructions. The instructions aren't as clear as they need to be on this. So, it's the judge's job. She's not just a referee calling balls and strikes. She's the judge with the power and authority and responsibility of instructing the jury correctly and accurately. It was never done here. Not only was the first answer, Mr. Howie said that we, the first, only the second question is an issue. That's not correct. The first issue, it's not, she was right if they were asking this or that. It was the bad question and a worse answer. So, the first is, the second answer issue was wrong too. And I said that in my brief. I didn't concede that. I believe Mr. Howie thought I conceded it, but it's at page 18 of my brief. So, the next point I'd like to make is that a plaintiff did not forfeit anything in here by making her suggestion as she did. She didn't forfeit the Gallich argument by making a suggestion, by suggesting they could find on one and then move on. Again, it's the judge's. It was just a suggestion and it wasn't her proper jury instruction in any way. So, that way it was a suggestion. It went no further than that. I don't see any forfeiture. There's certainly no knowing and intelligent application or waiver here. Next, about the instructions. If the jury, if the plaintiff has the right to be instructed as to her theory of the case, her theory of the case is not just that there should have been proper instructions given to the decedent. Of course, there should have been proper instructions. That's very vague and the theory of the case was go to the emergency room, call 911. I don't understand how that can even be an issue. Why that wouldn't be okay? Why the judge thought that was wrong? That was the case. So, then you go, well, it's corrected by plaintiff's closing argument. That only makes it worse in a sense because plaintiff then argues that this and then the jury gets instructed and there's nothing about 911 and there's nothing about calling, you know, going to the emergency room. To me, that's even more confusing than anything. So, I don't know. And this isn't just about the decree of detail that plaintiff wishes to have in her instruction. This is about plaintiff's theory of the case. So, that's on that. As far as Dr. Peppernick, Mr. Howie's arguments about that Dr. Peppernick's testimony was speculative. That's an argument for a jury. It's not an argument for a directed verdict. The doctor clearly and repeatedly said, Pat's bleed could have stopped if Dr. Tenenbaum had seen Pat on the record. It's 110 of the transcript there. That's it. He could have argued all of that to the jury. Oh, this is speculative. We don't know. Maybe Pat would have only gone in the morning and wouldn't have been there. We don't know any of that. We don't know. I mean, it's true. Pat had other things to do that afternoon. But if the doctor had said, I want to see you, there's no indication Pat wouldn't have seen there. The doctor conceded that Pat was compliant. I did ask you to wrap up, please. I'm done. Okay. All right. Oh, one more point. I'm sorry. I'm sorry. I'm so sorry. This is not at all like Aguilera or Susness or Townsend. I was on two of those three cases. And in Aguilera, the expert said he'd have to defer to somebody else. It was a similar kind of situation in Susness. I won both of those cases. This was not that kind of case. This is a case where the guy, Dr. Pamperdick, said what he had to say, that this was a deviation and proximate cause. If defense counsel wanted to argue against that, he had every opportunity to do so. Thank you very much. Okay. Thank you very much for the briefs and the arguments. And we will take the matter under advisement and issue an opinion forthwith. We are adjourned. Thank you.